**HOUSTON MERCANTILE EXCHANGE CORPORATION; Gary Boyd; Steve Green; Joe Bond; P & T Petroleros; and Leonard Wood, Appellants,**

v.

**DAILEY PETROLEUM CORPORATION, Appellee.**

No. 14–94–00305–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 29, 1996.

Kurt Arbuckle, Clinard J. Hanby, Joseph A. Bond, Houston, for appellants.

Ronald W. Wilson, Tracey Christopher, Rodney K. Caldwell, Stephen Cagle, Houston, for appellee.

Before LEE, HUDSON and EDELMAN, JJ.

## OPINION

EDELMAN, Justice.

In this trade secrets and unfair competition case, Houston Mercantile Exchange Corporation ("Houmex"), Gary Boyd, Steve Green, Joe Bond, P & T Petroleros ("P &

T"), and Leonard Wood appeal a judgment awarding actual and punitive damages to Dailey Petroleum Corporation ("Dailey") primarily on the grounds of insufficient evidence. We affirm as modified.

## Background

Dailey is a manufacturer of oil field equipment including a device known as a "drilling jar" which is used to free, i.e., jar loose, drill pipe which has become stuck in an oil or gas well. Although the patents on its drilling jar have expired, Dailey has continued to refine the designs of its jars and considers its design information, such as dimensions, tolerances, metallurgy, engineered drawings, and repair information, to be trade secrets.

Dailey protects the confidentiality of its design information in various ways. All of Dailey's employees, agents, and customers are required to sign non-disclosure agreements. Agents who market Dailey's jars do not purchase or own the jars, but instead take them on consignment and then rent them to customers by the day. In order for periodic maintenance and repairs to be performed on the drilling jars, Dailey supplies its agents with numbered repair manuals and spare parts, which are available only from Dailey. However, neither parts nor repair manuals are provided to customers, who are not authorized to disassemble the jars. Moreover, although Dailey has sold jars to foreign governments without non-disclosure agreements, the sales have generally been subject to other license and confidentiality restrictions.

In January of 1986, the United States imposed an economic embargo on trade with Libya. At the time, Dailey's agent there, D & G Oil Field Services and Equipment ("D & G") had forty of Dailey's jars and a Dailey repair manual. In March of that year, Dailey sued D & G in England to collect unpaid jar rentals and secure return of the jars, repair manual and any spare parts. As part of a settlement agreement, D & G agreed to return the jars and certain confidential information to Dailey, but failed to do so.

In August of 1988, two former Dailey executives, Ken Mills and Jerry Coker, formed Kenjer, Inc. ("Kenjer") to manufacture drilling jars. Mills and Coker approached Joe Bond about locating investors for their company. Bond was an attorney and former officer of D & G. Bond allegedly told Coker that he knew someone in England who had "reverse engineered" drawings of a drilling jar produced either by Dailey or another manufacturer, Eastman Whipstock.[1] Bond asked Mills and Coker if Kenjer would be interested in making jars for Bond's "European connection." They also looked into the possibility of manufacturing jars in Mexico. Before these discussions, Bond had set up a marketing company called Sup–R–Jar International Limited ("Sup–R–Jar") in the Isle of Man. John Lythgoe, an officer in a trust company located in the Isle of Man, helped Bond set up this company.

In the fall of 1988, a former Dailey regional manager, Steve Green, contacted Dailey manager, Art Porter, and allegedly asked to purchase several Dailey drilling jar parts. He also allegedly asked for the measurements of the barrel of the drilling jar and copies of a Dailey rental agreement and sales brochure. According to Porter, Green wanted the parts for a group of "ex-disgruntled employees" who were going into the international market with a jar like the Dailey jar. From his conversation with Green, Porter believed that Green wanted him to steal the parts from Dailey. With the permission of Dailey's management who wanted to investigate the matter, Porter sent a "packing kit" to the home address of Green's mother. Green, who became a Kenjer employee in 1990, paid for this kit with two money orders made out to Porter rather than Dailey and then allegedly took it to Mills.

At about this time, Coker received a packet that contained allegedly reverse-engineered drawings of the Dailey drilling jar (the "overseas drawings") accompanied by a cover letter, an order for parts that specified Dailey part numbers, and a Dailey repair

---

1. According to Dailey's President, James Farr, Eastman Whipstock was formerly Dailey's only agent worldwide and was sued by Dailey for producing its own jar by copying Dailey's design. According to Coker, the Eastman jar was interchangeable with the Dailey jar.

manual.[2] Coker photocopied the overseas drawings and then revised them to produce what are referred to as the "Coker sketches."[3] In addition, pursuant to the instructions in the cover letter, Coker delivered the overseas drawings to Bond's office. However, at the time of trial, Bond did not know the whereabouts of the overseas drawings.

In the fall of 1988, Houmex received an inquiry for drilling jar parts from HOH Supply Company ("HOH"), an international oil field supply company based in London. Houmex exports oil field tools, parts, and supplies and is managed by Gary Boyd. Because Boyd was not knowledgeable about drilling jars and Coker was the only person he knew who was in that business, Boyd passed the inquiry along to Coker at Kenjer to see if he could fill it. Boyd testified that he did not know at that time that the parts were for Dailey drilling jars. Kenjer filled the order with parts for which it charged $60,000 and Houmex then shipped the parts to HOH. At trial, appellants disputed Dailey's contention that these parts were ultimately bound for Libya.

Sometime in 1988 or 1989, Kenjer began circulating a sales brochure for the "Sup–R–Jar." The brochure did not disclose the name of the product manufacturer but looked similar to, and contained some of the same information as, Dailey's brochure for its drilling jar. Following Kenjer's sale of parts to Houmex and HOH, Dailey filed suit against Kenjer, Mills, and Coker to enjoin them from using Dailey's trade secrets. On March 2, 1990, a judgment was entered in that suit (the "injunction judgment") which enjoined Mills, Coker, Kenjer and "any party acting in concert" with them from using the overseas drawings, Coker sketches, or any Dailey

trade secret to manufacture a drilling jar or parts. However, the judgment allowed Kenjer to produce and market its own drilling jar and parts ("Kenjer's jars, parts") from other drawings which the court found to be based on information that did not contain Dailey's trade secrets, and which parts were not interchangeable with those of Dailey's jars.[4]

P & T is a company in Venezuela which is run and partly owned by Leonard Wood, another former D & G employee. By 1989 or 1990, P & T had translated Kenjer's Sup–R–Jar brochure into Spanish and begun using it to market drilling jars in Venezuela. It began renting Kenjer jars there in April of 1990.

Ira Neal, an oil field worker in Venezuela, testified that in 1990 he worked on a well in which a drilling jar from P & T was used. The shape of the jar looked like a Dailey jar but it was painted red and gold, the colors used on Sup–R–Jars, rather than the light blue color which Dailey jars are painted. However, when the jar was later pulled out of the well after being used, the red and gold paint was mostly worn off and under it was the light blue paint used on Dailey jars. Neal stated that "it looked to me like somebody painted a Dailey jar."

On April 26, 1990, Dailey filed this suit against appellants for (a) conspiracy to misappropriate trade secrets concerning Dailey's drilling jar, and (b) unfair competition in marketing Dailey's mechanical drilling jar as their own. The case was tried to a jury which found in favor of Dailey and against all appellants on both claims. The jury verdict awarded Dailey $1.6 million in actual damages and slightly over $2 million in punitive damages,[5] and the trial court entered judg-

---

2. The source of these materials was unclear. The cover letter was allegedly lost and was not offered into evidence at trial. After testifying at an earlier proceeding that the materials were from Lythgoe, Bond testified at trial that he did not know their source. However, a Dailey witness testified that Lythgoe knew nothing about the drawings or drilling jars.

3. According to the testimony of a Dailey engineer, although the overseas drawings appeared to be reversed-engineered, the Coker sketches contained the exact dimensions of the Dailey jar

which would have had to be taken from a Dailey drawing.

4. The injunction judgment further allowed Dailey to verify Kenjer's compliance with inspections by an independent consultant during the first two years after the judgment. However, Dailey has not alleged in this appeal that the injunction judgment has not been complied with.

5. Punitive damages were awarded against the appellants in the following amounts: Wood, $500,000; P & T, $500,000; Bond, $1,000,000;

ment in accordance therewith.[6]

## Standards of Review

■ In reviewing the legal sufficiency of evidence, we consider only the evidence and inferences that tend to support the jury's findings and disregard all evidence and inferences to the contrary. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995). A jury's finding will be upheld if more than a scintilla of evidence supports it. *Id.* More than a scintilla of evidence exists where the evidence supporting the finding rises to a level that would enable reasonable minds to differ in their conclusions. *Id.* To the extent that the form of questions and instructions submitted in the charge are not objected to at trial and challenged on appeal, we evaluate the sufficiency of the evidence in light of the questions and instructions submitted. *See Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985).

■ Although an ultimate fact may be established by circumstantial evidence when

that fact may be fairly and reasonably inferred from other facts in the case, circumstantial evidence must still consist of more than a scintilla to withstand a no-evidence challenge. *Blount v. Bordens*, 910 S.W.2d 931, 933 (Tex.1995). Where circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex.1995).

## Actual Damages

■ In their fourth point of error, appellants complain that the evidence is legally and factually insufficient to support the jury's finding of actual damages.[7] Because our conclusion on this point of error is also dispositive of the remaining points of error,[8] we address it first.

Because the types of damages Dailey was claiming were not specified in its petition, the jury charge [9] or Dailey's jury argument,[10] we

---

and Green, $30,000. No punitive damages were assessed against Boyd or Houmex.

6. Although not part of the jury verdict, the judgment also granted Dailey injunctive relief which is not challenged in this appeal.

7. Although Houmex, Boyd, Green and Bond filed a brief separate from that of Wood and P & T, the six points of error in each brief are substantially the same.

8. In points of error one and two, appellants challenge the sufficiency of the evidence to support the jury's finding of liability for misappropriation of trade secrets and unfair competition. In point of error three, appellants argue that Dailey's damages were either waived or precluded by res judicata, collateral estoppel or election of remedies as a result of the injunction judgment. In point of error six, appellants challenge the method specified in the judgment for calculating prejudgment interest on the award of actual damages. Because we reverse the award of actual damages in point of error four, we need not address the challenge to liability or the method of calculating prejudgment interest on the actual damages awarded. Our disposition of point five is discussed in the last section of this opinion.

9. Following the first two questions of the court's charge in which the jury found that all six defendants had engaged in both misappropriation of Dailey's trade secrets and unfair competition

with Dailey, the economic damage question and the jury's answer to it provided:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Dailey] for its damages, if any, resulting from the conduct you have found in Question No. 1 or Question No. 2?
> Answer in dollars and cents, if any.
> Answer: $ 1,600,000.00

Although appellants objected to this question at trial on the grounds of no evidence and insufficient evidence, they did not object to the form of it, such as for being too broad or failing to provide a proper legal measure of damages under the applicable theories of recovery. *See Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex.1987); *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex.1973).

10. With regard to damages, Dailey's counsel argued:

> Question No. 3, you're asked to find what the damages are to Dailey. What sum of money would compensate Dailey? We presented testimony that Dailey has been damaged an amount of approximately $5 million. I don't know what the exact number is. You can't. They've said that—well, there aren't that many jars out there, it wouldn't be that high. Maybe, but you heard Dr. Fry say, "I didn't even look at future losses. I just stopped it here. They're going to continue to be damaged in the future. Furthermore, I didn't even consider the south Texas losses. There's damage down there as well."

have only the evidence presented at trial by which to both identify the types of damages Dailey sought and assess the sufficiency of the evidence supporting those damages. Dailey argues that its damage award was supported by the testimony of its President, James Farr, its former President, Donald McKenzie, and its economist, Dr. Clifford Fry.

In this regard, Farr testified about the type of harm Dailey suffers when customers are deceived into buying other jars on the understanding they are Dailey jars. He also cited an instance in which Dailey's agent reported that another company was bidding to a Turkish oil company for jars and parts with the same specifications as those of Dailey. Farr further testified that the overseas drawings had made their way to a European company called Pioneer Oil Tools which produced a jar identical to Dailey's. However, Farr did not attempt to quantify any losses Dailey may have suffered from these occurrences.

Similarly, McKenzie testified that before Wood and P & T went into competition with Dailey in Venezuela, Dailey had a high market share there, but not 100 percent. He further stated that P & T took "a portion" of Dailey's market share in Venezuela, but not a "significant portion" of it.[11] However, McKenzie did not reduce this alleged loss of market share to numbers or otherwise state an amount of damages.

Fry sought to "determine the impact on Dailey of the conspiracy that was formed that resulted in the formation of Kenjer and its continuing operation, the unfair competition." To do this, he estimated the total number of Kenjer jars "in operation"[12] from deposition testimony in the case, and calculated the "marginal profit"[13] Dailey earned on its drilling jars from reviewing Dailey's financial information. Fry worked from the assumption that the formation and ongoing existence of Kenjer was attributable to the alleged conspiracy to use Dailey's trade secrets to produce a competing jar like Dailey's and to use Dailey's sales brochure to market this Dailey-like jar as Kenjer's own. Under this approach, therefore, each rental of a Kenjer jar was, in effect, a rental that rightfully belonged to Dailey and thereby deprived Dailey of the marginal profit it would have earned had *it* rented the jar.

To calculate this damage, Fry multiplied the monthly number of Kenjer jars in operation by the average monthly Dailey profit per jar to produce an amount of monthly lost profit for the period in question. According to Fry's figures, the minimum past[14] lost profits Dailey suffered as a result of the Kenjer conspiracy for the entire period in issue was over $4.7 million.

Because Dailey sought to recover damages in the form of lost profits, we will review the evidence in light of the law applicable thereto. Recovery of lost profits does not require that the loss be susceptible to exact calculation. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994)

---

Ladies and gentlemen, I don't know what the number is. I think it's at least $5 million. It might be seven. It might be eight. It might be four, but Dailey has been damaged and no one can dispute the fact that these men, by starting that ball rolling and by setting up this company in their little conspiracy, a little cabal, if you will. That is what enabled Kenjer to start, and had it not been for the conspiracy, had it not been for the efforts of these men, this company would not have formed and they wouldn't be out there taking business away from us.

**11.** Fry testified that Dailey's market share in Venezuela was 43 percent at the time of trial.

**12.** Fry took into account Kenjer jars in operation in Venezuela and other countries, but not those in South Texas. According to Fry, for each jar requested by and charged to a customer in those countries, two jars were actually sent in order to provide a spare or "standby" jar if needed. Therefore, the number of Kenjer jars Fry considered to be "in operation" was half the total number of Kenjer jars in each country.

**13.** According to Fry, "marginal profit" on a drilling jar was the amount Dailey would lose by not leasing a drilling jar. It is measured by the difference between the incremental revenue earned and the incremental cost incurred when an additional jar is leased.

**14.** Fry made no calculation of *future* lost profits from Kenjer's ongoing activities.

(per curiam).[15] However, the injured party must do more than show they suffered some lost profits. *Id.* The amount of the loss must be shown by competent evidence with reasonably certainty. *Id.* What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Id.* At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Id.* Recovery of lost profits must be predicated on one complete calculation. *Id.* An expert's opinion which is based on assumed facts that vary materially from the actual, undisputed facts is without probative value and cannot support a verdict or judgment. *Burroughs Wellcome,* 907 S.W.2d at 499.

■ More generally, in order to recover any type of damages, a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 181 (Tex.1995). This requirement is met when a jury is presented with pleading and proof that establish a direct causal link between the damages awarded, the actions of the defendant and the injury suffered. *Id.*

In this case, there are two formidable difficulties with Fry's calculation. The first is that, in multiplying the number of Kenjer jars in operation by the average monthly marginal profit of a Dailey jar, Fry stated that he assumed that each such Kenjer jar was rented every day of each month. However, we have found no evidence in the record whether the Kenjer jars were, in fact, rented for all, part, or none of any month or other time period. For any period that any Kenjer jars in operation may not have been rented, they could not have earned a profit which rightfully belonged to Dailey. Therefore, the evidence gave the jury no objective basis to determine the extent to which rentals of Kenjer jars actually deprived Dailey of profits.

The second and more fundamental difficulty with Fry's calculation is in its assumption that, because the very existence of Kenjer was attributable to the conspiracy, every Kenjer drilling jar in operation represented lost profit to Dailey. As Fry admitted, all of the Kenjer jars upon which his calculation was based were the type that Kenjer was lawfully authorized to make and sell pursuant to the injunction judgment. Therefore, in order for Fry's calculation to be a valid measure of Dailey's loss from the appellants' alleged misconduct, the jars produced in compliance with the injunction judgment must also have been the product of a misappropriation of Dailey's trade secrets or unfair competition with Dailey. Yet, the thrust of the injunction judgment was that Kenjer was authorized to produce and market those jars for the very reason that they did not misappropriate Dailey's trade secrets. Moreover, Fry's calculation was not tied in any way to that portion of the rentals of jars which may have resulted from unfair competition by the appellants, such as marketing Kenjer jars with the Dailey brochure information, but instead extended globally to every Kenjer jar in operation.[16] Under these circumstances, Fry's calculation presents no evidence of whatever damages Dailey may have suffered from the alleged misappropriation of its trade secrets or unfair competition. Finding no other evidence in the record of a direct causal link between the damages awarded, appellants' alleged misconduct and the injury suffered, we sustain the legal sufficiency challenge in appellants' fourth point of error and do not reach the factual sufficiency challenge.

### Punitive Damages

In point of error five, appellants challenge the award of punitive damages on the grounds of legally or factually insufficient

---

**15.** *See also Texas Instruments, Inc. v. Teletron Energy Management, Inc.,* 877 S.W.2d 276, 279 (Tex.1994); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992).

**16.** Moreover, although Coker testified that Kenjer sold $60,000 worth of *parts* to Houmex, Fry offered evidence of lost profits attributable only to jars, not parts. Therefore, even if that sale resulted from misappropriation of trade secrets or unfair competition, there was no evidence upon which to determine an amount of lost profits resulting from it.

evidence to support the jury's finding of willful, wanton, or conscious disregard of Dailey's rights.

■ On the one hand, where there is no recovery of actual tort damages, there can be no recovery of punitive damages. *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex.1995). On the other hand, we are generally not authorized to reverse a judgment in the absence of properly assigned error, and thus cannot address contentions which appellants have either failed to raise or chosen to abandon. *See, e.g., Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex.1990); *Prudential Ins. Co. v. J.R. Franclen, Inc.*, 710 S.W.2d 568, 569 (Tex.1986) (holding that summary judgment granted on limitations could not be challenged on appeal on a relation-back theory even though that theory had properly been raised in appellant's summary judgment response because, on appeal, appellant chose instead to rely exclusively on an exception theory).

In the instant case, appellants challenged the award of punitive damages in post-verdict motions on various theories, including legal and factual insufficiency of the evidence, waiver, election of remedies, res judicata, collateral estoppel, excessiveness, and violations of the due process and excessive fines provisions of the United States and Texas Constitutions. However, *on appeal,* the punitive damage award was challenged solely on the ground of legally or factually insufficient evidence of the appellants' wrongful conduct. Ordinarily, this would not be sufficient to preserve a challenge to punitive damages on any other grounds.

■ However, in *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 613–14 (Tex.1996), an award of punitive damages was reversed upon a finding of no evidence of actual damages, even though we find no indication in the opinion, the points of error upon which writ of error was granted,[17] or the opinion of the court below[18] that the award of punitive damages was challenged on the basis of no recovery of actual damages.

We interpret this to mean that an award of punitive damages, such as that in this case, must automatically be reversed where the underlying award of actual damages is reversed, and even where the punitive damage award has not been challenged for the lack of actual damages. Therefore, we do not reach point of error five.

Accordingly, the portions of the trial court's judgment awarding actual and punitive damages is reversed, judgment is rendered that Dailey recover no lost profits or punitive damages for the time period prior to trial, and the remainder of the judgment is affirmed.

---

17. *See* 37 Tex. Sup. Ct. J. 878–79 (June 8, 1994).

18. *See Fidelity & Guar. Ins. Underwriters v. Saenz,* 865 S.W.2d 103 (Tex.App.—Corpus Christi 1993) *rev'd,* 925 S.W.2d 607 (Tex.1996).