# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 20, 2010

No. 08-10521

Lyle W. Cayce
Clerk

MGE UPS SYSTEMS INC

Plaintiff - Appellant - Cross-Appellee

v.

GE CONSUMER AND INDUSTRIAL INC; GE INDUSTRIAL SYSTEMS INC; GENERAL ELECTRIC COMPANY; POWER MAINTENANCE INTERNATIONAL INC

Defendants - Appellees - Cross-Appellants

Appeal from the United States District Court
for the Northern District of Texas

Before BARKSDALE, GARZA, and PRADO, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

MGE UPS Systems, Inc. ("MGE") appeals the district court's Federal Rule of Civil Procedure 50(a) dismissal of its Digital Millennium Copyright Act ("DMCA") claim against Power Maintenance International, Inc. ("PMI"); General Electric Company ("GE"); GE Consumer and Industrial, Inc.; and GE Industrial Systems, Inc. (collectively, "GE/PMI"). MGE also appeals the district court's denial of prejudgment interest on MGE's damages award. GE/PMI cross-appeals on four grounds: (1) whether the district court erred in dismissing GE/PMI's Rule 50(a) motion because MGE failed to present evidence of damages, or in the

alternative, whether the district court erred in dismissing GE/PMI's Rule 50(b) motion because the $4.6 million jury award was not a reasonable calculation of damages; (2) whether MGE impermissibly double-recovered damages; (3) whether the parties had a tolling agreement in place that permitted MGE to recover damages prior to December 17, 2001; and (4) whether the district court erred in granting MGE injunctive relief against GE/PMI.

**I**

Uninterruptible power supply ("UPS") machines are used during periods of power outages to provide power to critical operating systems. MGE manufactures several lines of UPS machines, some of which require the use of MGE's copyrighted software programs Pacret and Muguet during servicing. This software fixes calibration problems more quickly than traditional manual servicing techniques. Without the software, a service technician can still partially service an MGE UPS machine, but a number of critical procedures (including recalibration and adjustment of voltage levels) can only be performed through use of the software, which works only on MGE-manufactured devices.

The software requires connection of an external hardware security key (called a "dongle") to the laptop serial port. Each dongle has an expiration date, a maximum number of uses, and a unique password. When the software is activated, it searches for a properly programmed dongle before it will fully launch. Once launched, the software will go through a second series of protocol exchanges with the data located on the UPS machine's microprocessors to confirm that MGE software is communicating with MGE hardware. If the protocol exchange is successful, MGE's software proceeds to collect system status information for the technician.

Years after MGE introduced its security technology, a number of software hackers published information on the internet disclosing general instructions on how to defeat the external security features of a hardware key. Once the

software is cracked and the security key is defeated, the software can be accessed and used without limitation.

PMI is a critical power service company servicing a variety of brands of UPS machines, including MGE UPS machines. PMI initially subcontracted MGE to perform software service on MGE UPS machines, but sometime before June 2000, a group of PMI employees obtained at least one copy of MGE's software from an unknown source. GE acquired PMI in 2001.

In December 2004, MGE filed suit against GE/PMI for, *inter alia*, copyright infringement, misappropriation of trade secrets, unfair competition, conversion, and DMCA violations. GE/PMI does not dispute liability, inasmuch as it admits to recovering a laptop from a former PMI employee that contained hacked MGE software, and admits to five instances of this software's use from June 2000 through May 2002. MGE alleges that GE/PMI used the software a total of 428 times, including uses after the district court granted MGE a preliminary injunction against GE/PMI's use of MGE's software and trade secrets.

During the proceedings for this action, GE/PMI moved, renewed, and re-urged motions for summary judgment and judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50(a) and (b) arguing, *inter alia*, that MGE could not sustain a DMCA cause of action against GE/PMI. After initially denying GE/PMI's pretrial motion for summary judgment and its Rule 50(a) motion on MGE's DMCA claim, the district court dismissed the DMCA claim during an off-record jury charge conference. The jury found that GE/PMI had infringed MGE's copyrights, misappropriated MGE's trade secrets, and committed unfair business practices. The jury awarded MGE the following damages:

No. 08-10521

A.   Damages for misappropriation of trade secrets on MGE's data disk:

   1.   Net profits earned by GE/PMI from January 1, 2001 to December 17, 2001: $460,000

   2.   Net profits earned by GE/PMI from December 18, 2001 to August 15, 2005: $1,852,000

B.   Damages for copyright infringement:

   1.   Net profits earned by GE/PMI from January 1, 2001 to December 17, 2001: $368,000

   2.   Net profits earned by GE/PMI from December 18, 2001 to August 15, 2005: $1,852,000

C.   Damages for misappropriation of MGE software trade secrets:

   1.   Net profits earned by GE/PMI from January 1, 2001 to December 17, 2001: $92,000

   2.   Net profits earned by GE/PMI from December 18, 2001 to August 15, 2005: $0

TOTAL:   $4,624,000

The district court awarded MGE the total jury verdict, post-judgment interest, a permanent injunction against GE/PMI, impoundment of infringing materials, taxable costs, and attorney's fees. The district court declined to award prejudgment interest on the damage awards.

## II

MGE argues that the district court erred in granting GE/PMI's Rule 50(a) motion dismissing MGE's DMCA violation claim. We review *de novo* a trial court's decision on a Rule 50(a) motion for judgment as a matter of law, viewing all of the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Resolution Trust Corp. v. Cramer*, 6 F.3d 1102, 1109 (5th Cir. 1993) (internal quotations omitted). A Rule 50(a) motion is properly granted "[i]f the facts and inferences point so strongly and

overwhelmingly in favor of the moving party . . . that reasonable jurors could not have arrived at a contrary verdict." *Id.* (citation omitted).

GE/PMI argues that MGE's dongle does not actually prevent copying of MGE's software, but merely prevents *access* to the software. Once that access is breached, there are no barriers to copying the software. Accordingly, GE/PMI argues that MGE's software is "freely accessible" within the meaning of the DMCA because the dongle does not block the type of "access" the DMCA is designed to prevent. Furthermore, though the MGE software in GE/PMI's possession "was modified" to eliminate the need for a dongle, MGE has not presented evidence that a PMI employee initially modified the software.

One of Congress' purposes behind enacting the DMCA was targeting the circumvention of technological protections. *See Davidson & Assocs. v. Jung*, 422 F.3d 630, 639–40 (8th Cir. 2005). The DMCA's anti-circumvention provision states, "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). To "circumvent a technological measure" means to "descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). "Effectively controls access to a work" means that "the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B). GE/PMI does not contest that MGE's software was a work protected under Title 17 of the Copyright Act.

The DMCA does not describe the type of "access"-controlling technological measure required to invoke the DMCA's protections, and this is an issue of first impression in this Circuit. MGE proposes a definition from a Fifth Circuit non-DMCA case that discussed copyright issues and determined "access" to

include "an opportunity to view the copyrighted work." *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 113 (5th Cir. 1978) (citing 3 M. NIMMER, COPYRIGHT § 13.02(A) (1978)). Reading this definition alongside definitions from Merriam-Webster's dictionary and Black's Law Dictionary, MGE concludes that "access" means "viewing, making use of, or using the protected work." MGE argues that dongles prevented access to its software and that without using both this hardware key and its corresponding password, a user cannot view, gain access to, or make use of the software.

However, MGE advocates too broad a definition of "access;" their interpretation would permit liability under § 1201(a) for accessing a work simply to view it or to use it within the purview of "fair use" permitted under the Copyright Act. Merely bypassing a technological protection that restricts a user from viewing or using a work is insufficient to trigger the DMCA's anti-circumvention provision. The DMCA prohibits only forms of access that would violate or impinge on the protections that the Copyright Act otherwise affords copyright owners. *See Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1202 (Fed. Cir. 2004). The Federal Circuit, in analyzing the DMCA's anti-circumvention provision, concluded that it "convey[s] no additional property rights in and of themselves; [it] simply provide[s] property owners with new ways to secure their property." *Id.* at 1193–94. Indeed, "virtually every clause of § 1201 that mentions 'access' links 'access' to 'protection.'" *Id.* at 1197. Without showing a link between "access" and "protection" of the copyrighted work, the DMCA's anti-circumvention provision does not apply. The owner's technological measure must protect the copyrighted material against an infringement of a right that the Copyright Act protects, not from mere use or viewing. *Id.* at 1204; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004) *(*finding no DMCA anti-circumvention liability where an authentication sequence in a printer microchip blocked one

form of access (printer function) but permitted free access from other avenues (for example, anyone who purchased that brand of printer could download a copy of the program)).

Here, MGE has not shown that bypassing its dongle infringes a right protected by the Copyright Act. MGE's dongle merely prevents initial access to the software. If no dongle is detected, the software program will not complete the start-up process. However, even if a dongle is present, it does not prevent the literal code or text of MGE's copyrighted computer software from being freely read and copied once that access is obtained; there is no encryption or other form of protection on the software itself to prevent copyright violations. Because the dongle does not protect against copyright violations, the mere fact that the dongle *itself* is circumvented does not give rise to a circumvention violation within the meaning of the DMCA.

Moreover, the DMCA's anti-circumvention provision does not apply to the use of copyrighted works *after* the technological measure has been circumvented, targeting instead the circumvention itself. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2d Cir. 2001). MGE cites no evidence that a GE/PMI employee or representative was responsible for altering the Pacret and Muguet software such that a dongle was not required to use the software. Without proving GE/PMI actually circumvented the technology (as opposed to using technology already circumvented), MGE does not present a valid DMCA claim. *See id.* ("[T]he DMCA targets the *circumvention* of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the *use* of those materials after circumvention has occurred.").

Because the DMCA does not apply to mere use of a copyrighted work, and because MGE has not shown that GE/PMI circumvented MGE's software protections in violation of the DMCA, the district court did not err in granting GE/PMI's Rule 50(a) motion dismissing MGE's DMCA claim.

### III

GE/PMI argues the district court erred in denying its Rule 50(a) motion with regard to MGE's claim under the Copyright Act because the testimony of MGE's damages expert had been stricken, and MGE improperly relied on PMI's total gross revenue figure rather than the portion reasonably related to the copyright infringement.  For the same reason, GE/PMI argues MGE failed to prove all the elements of its state law misappropriation of trade secrets and unfair competition claims: without introducing evidence of PMI's profits related to the infringement, MGE has failed to prove damages for these claims.

### A

GE/PMI argues that the district court erred in denying its Rule 50(a) motion because MGE failed to present sufficient evidence of damages.  Under 17 U.S.C. §§ 504(a)(1) and (b), a copyright owner is permitted to recover his own "actual damages," including lost profits and "reasonable royalty rates," or what a willing buyer would have been reasonably required to pay a willing seller as a licensing fee for the actual use of the copyrighted material by the infringers. *Davis v. Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001).  A copyright owner may also seek "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."   17 U.S.C. § 504(b).  If the copyright owner chooses to claim infringer's profits, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*; *see also Estate of Vane v. Fair, Inc.*, 849 F.2d 186, 188 (5th Cir. 1988) (applying this standard to copyright infringement action seeking infringer's profits).  GE/PMI argues that MGE failed to satisfy the first step of proving infringer's profits because MGE's only evidence of gross revenues was Exhibit DX-37, a one-page bar graph showing PMI's "total revenue" from all lines of business from

2001 through 2004. GE/PMI contends that this chart includes undifferentiated gross revenue from servicing a variety of brands of equipment, not merely MGE equipment, and therefore does not reflect revenues "attributable to the infringement."

"[O]nce liability has been shown, § 504(b) creates an initial presumption that the infringer's 'profits . . . attributable to the infringement' are equal to its gross revenue." *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005) (alteration in original) (quoting 17 U.S.C. § 504(b)). "In meeting its initial burden, however, a copyright holder must show more than the infringer's total gross revenue from *all* of its profit streams. . . . Rather, 'gross revenue' refers only to revenue *reasonably related* to the infringement." *Id.* (emphases added); *see also Davis*, 246 F.3d at 159–60 (finding proffered evidence of defendant's total gross revenues too broad to support a copyright infringement claim based on defendant's use of plaintiff's copyrighted eyeglasses in an ad campaign); *Estate of Vane*, 849 F.2d at 188, 190 (finding that "a lump-sum figure for profits attributable to the television commercials that contained infringed material as a whole without accounting for the fact that the infringed material constituted only a fraction of any given commercial" was too speculative a connection to sustain damages); *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983) (finding insufficient for § 504(b) purposes that plaintiff showed defendant's gross revenues from the sales of *all* products instead of demonstrating gross revenues from sale of the infringing products).

MGE sought over $100 million in damages based almost exclusively on the testimony of its only damages expert, Dr. Laurance Prescott. Dr. Prescott's testimony related to two damage models: (1) MGE's lost profits; and (2) recovering a reasonable royalty. Notably, Dr. Prescott did not testify to GE/PMI's profits attributable to the infringement. The district court carried

No. 08-10521

GE/PMI's Federal Rule of Evidence 702 and *Daubert*[1] objections to Dr. Prescott's testimony and permitted him to testify at trial. After hearing his testimony, the district court concluded that it should be stricken in its entirety, determining that Dr. Prescott's conclusions regarding MGE's lost profits were based on insufficient facts and data, including unsupported assumptions regarding MGE's lost market share and service pricing. The district court also found Dr. Prescott had no experience in assessing hypothetical reasonable royalty rates and that his proffered hypothetical reasonable royalty rate was not based on objective analysis.

Once Dr. Prescott's testimony was stricken, MGE offered a final witness, MGE general manager Michael O'Brien, who presented testimony relating only to MGE's reasonable royalty damages. O'Brien was never designated as an expert on damage calculations. The district court ultimately found his testimony insufficient to permit MGE to offer a jury instruction on reasonable royalty damages.[2]

MGE's only remaining evidence of damages was DX-37, the bar graph indicating PMI's total revenue from 2001 through 2004. Though this was an exhibit prepared by GE/PMI, the district court admitted the exhibit during Dr.

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).

[2] Typically, to demonstrate reasonable royalty damages, a plaintiff presents evidence as to "what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). However, O'Brien was only able to testify as to the royalty amounts that MGE would ask a competitor to pay to *prevent* that competitor from entering the UPS service industry––that is, staggeringly high royalty amounts that would price out competitors. Such amounts are not cognizable as a "reasonable royalty" calculation at which a buyer and seller would agree to be market value for a particular piece of software. *See Alcatel USA, Inc. v. Cisco Sys.*, 239 F. Supp. 2d 660, 669 (E.D. Tex. 2002) ("[T]his measure is to be calculated based on a reasonable royalty to which the parties *would have agreed* at the time of the alleged misappropriation. While the Court recognizes that some degree of speculation is inherent in calculating a suppositious licensing agreement between two parties that has never occurred, this hypothetical construct . . . must contain some degree of certitude." (emphasis added)).

No. 08-10521

Prescott's re-direct examination. MGE questioned Dr. Prescott only on the lack of GE revenue represented on DX-37's graph. Dr. Prescott was not questioned about whether the total PMI revenue indicated on the graph represented revenue related to PMI's infringement of MGE's copyright.[3]

GE/PMI argues that it would not have included DX-37 in its proposed exhibits had it known that Dr. Prescott's testimony would be stricken[4] because it had no idea MGE would be seeking GE/PMI's profits rather than MGE's own lost profits and reasonable royalties. MGE contends that seeking defendant's profits was not a new theory of recovery because the Joint Pretrial Order indicates that it sought "monetary damages pursuant to 17 U.S.C. § 504" for copyright infringement. This provision encompasses all types of damages available for copyright infringement, including the copyright owner's actual damages, the infringer's profits attributable to the infringement, and statutory damages. However, in its Federal Rule of Civil Procedure 26(a) disclosures, when asked to provide "a computation of each category of damages claimed," MGE indicated that Dr. Prescott's testimony would comprise its damages calculation. Dr. Prescott only testified to MGE's actual damages: MGE's own lost profits and reasonable royalty rates. In other words, the record indicates that MGE planned to rely entirely on its actual damages claim; GE/PMI had no reason to think that MGE was seeking GE/PMI's profits attributable to the infringement, nor was it prepared to defend against such a claim.

"[W]hen one of the *prima facie* elements of a claim is damages and the claimant fails to introduce evidence of those damages, he or she commits a fatal

---

[3] The trial transcript indicates that MGE may have been trying to refer to a different graph (DX-42, a comparison of MGE UPS equipment gross revenue versus UPS service gross revenue from 1997 through 2007) when it requested to admit DX-37.

[4] GE/PMI alleges it only intended to use DX-37 to impeach Dr. Prescott's assertion that as MGE's revenues went down, GE/PMI's revenues went up; the exhibit shows PMI's total revenue remaining relatively constant from 2001 through 2004.

error." *Prunty v. Ark. Freightways, Inc.*, 16 F.3d 649, 652 (5th Cir. 1994). MGE's decision to seek GE/PMI's profits was clearly a last-minute attempt to save its copyright infringement claim from dismissal for failure to prove damages. MGE has not succeeded. GE/PMI presented evidence that approximately 10% of PMI's UPS service business came from MGE-branded machines, and MGE's software was usable only with MGE UPS machines and not with competitors' products. Thus, PMI's total revenue far exceeds the approximately 10% of revenue reasonably related to the infringement of MGE's copyright. MGE needed to present a more narrowly tailored calculation of PMI's profits in order to cognize a claim for copyright damages "attributable to the infringement." Accordingly, the district court erred in denying GE/PMI's Rule 50(a) motion on MGE's copyright infringement claims because MGE has not shown damages under § 504(b).

**B**

GE/PMI argues the district court erred in denying its Rule 50(a) motion regarding MGE's misappropriation of trade secrets and unfair competition claims because the evidence did not support damages for these claims. At the close of MGE's case, the only evidence introduced to support its damages claims was the aforementioned DX-37 chart showing PMI's total revenues earned from all sources of income. GE/PMI contends that without evidence of PMI's net profits earned on the MGE equipment at issue, MGE's state law claims should have been dismissed on GE/PMI's Rule 50(a) motion.

There is little precedent under Texas law to guide us in determining whether MGE has sustained the burden of proof required of a plaintiff seeking to recover a defendant's net profits. In the only reported Texas case involving the recovery of defendant's profits for a misappropriation of trade secrets claim, the Dallas Court of Appeals held that although defendant's profits are a "proper element[ ] of damages in a case involving the wrongful use of a trade secret," a

plaintiff cannot recover damages without offering evidence "to show the actual profit made by [defendant]." *Elcor Chem. Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204, 214 (Tex. Civ. App.—Dallas 1973, writ ref'd n.r.e.); *see also Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 723 (5th Cir. 2006) (unpublished) (interpreting Texas law to permit a plaintiff to "seek damages measured by the defendant's actual profits resulting from the use or disclosure of the trade secret"); *Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.*, 930 S.W.2d 242, 248 (Tex. App.—Houston [14th Dist.] 1996, no writ) (finding that, as a threshold requirement to recovering damages for trade secret and unfair competition claims, "a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant").

In the instant matter, MGE faces the same problems showing "actual profits resulting from the use or disclosure of the trade secret" as it did on its copyright claim. DX-37 demonstrated PMI's *total revenue*, not "actual profits." MGE has not presented evidence that provides any means of distinguishing revenue PMI gained from other sources from revenue gained through misappropriation of MGE's trade secrets, let alone a calculation of profits from the relevant portion of revenue. MGE attempts to distinguish *Elcor* by arguing that DX-37 is "credible evidence of PMI's profits," but MGE needed to take additional steps to deduct unrelated revenue and costs from these total figures in order to demonstrate PMI's *profits* related to the infringement. MGE failed to do so.

However, MGE argues that comment f to the RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 (1995) governs damages under Texas law, and contends that it met its burden under this burden-shifting framework:

> The traditional form of restitutionary relief in an action for the appropriation of a trade secret is an accounting of the defendant's

profits on sales attributable to the use of the trade secret. . . . The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits.

MGE points to PMI's total revenue in DX-37 and argues that, under the Restatement, this exhibit satisfies its burden of proof with regard to PMI's "sales" of providing service to UPS machines. MGE contends that GE/PMI subsequently had the burden of demonstrating which portions of PMI's revenue were not attributable to the state law claims, which it failed to do.

Texas courts have not adopted the RESTATEMENT (THIRD) OF UNFAIR COMPETITION in its entirety and whether § 45's comment f is controlling in Texas courts is still an open question. *See, e.g.*, *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003) (following the original RESTATEMENT OF TORTS' definition of and factors used to identify trade secrets, despite this section's slight alteration thereof in the RESTATEMENT (THIRD) OF UNFAIR COMPETITION[5]); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471–72 (Tex. 1991) (adopting an "instructive" portion of the RESTATEMENT (SECOND) OF TORTS but noting that the Texas Supreme Court has not adopted the RESTATEMENT in its entirety). The burden-shifting procedures noted in comment f are not included in the first RESTATEMENT OF TORTS, whose definition of and factors used to identify trade secrets are still used by Texas courts. *See In re Bass*, 113 S.W.3d at 739–40. Neither the Texas Supreme Court nor any of the Texas appellate courts have specifically applied comment f to determine a defendant's profits in a trade secret action. Given that comment f's standard sets a plaintiff's burden of proof for trade secret damages

---

[5] The concept of unfair competition, which was originally included in the first RESTATEMENT OF TORTS and was tentatively slated for inclusion in the RESTATEMENT (SECOND) OF TORTS, is now addressed in the RESTATEMENT (THIRD) OF UNFAIR COMPETITION.

lower than the standard applied in *Elcor*, we conclude that the Texas Supreme Court would not adopt the burden-shifting procedures of comment f.

Accordingly, the district court erred in declining to grant GE/PMI's Rule 50(a) motion on MGE's misappropriation of trade secrets and unfair competition claims.

## IV

GE/PMI contends the district court erred in denying its Rule 50(b) motion at the close of the case because there was legally insufficient evidence to support the jury's $4.6 million damage award; in denying its request to apply the One-Satisfaction Rule to MGE's recovery under Texas law; and in concluding that damages from acts occurring before December 17, 2001 were not barred by the three-year statute of limitations under both the Copyright Act and Texas law. Additionally, MGE contends the district court abused its discretion by denying MGE's request for prejudgment interest on damages. Because the district court erred in dismissing GE/PMI's Rule 50(a) motion at the close of MGE's case because MGE has failed to prove its damages claims, these arguments are moot.

## V

GE/PMI appeals the district court's grant of a permanent injunction against GE/PMI's use of MGE's software and trade secrets. We review the denial or grant of a permanent injunction for an abuse of discretion. *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 402 (5th Cir. 2008).

Section 502 of the Copyright Act authorizes the court to grant "'final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.'" *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (quoting 17 U.S.C. § 502(a)). GE/PMI contends that in 2005 it turned over the only infringing article, a laptop that had not been used

No. 08-10521

since 2002, and that the only data disk found was in a former employee's possession who admitted to keeping it for his own reference after he left the company. However, GE/PMI admitted to five instances of direct copyright infringement, and MGE presented numerous instances of GE/PMI's infringing activity at trial, including some uses of MGE software that occurred after the district court entered its preliminary injunction and impoundment order in August 2005. Additionally, the laptops of two trial witnesses who admitted to using MGE software and trade secrets, respectively, were never recovered, and GE/PMI failed to offer conclusive evidence to account for these laptops' absence.

Given that there may be infringing materials still in GE/PMI's possession, and given GE/PMI's failure to conform to the constraints of the preliminary injunction, the district court did not abuse its discretion in granting a permanent injunction against GE/PMI's future use of MGE's software and trade secrets.

## VI

For the foregoing reasons, we AFFIRM the district court's grant of GE/PMI's Rule 50(a) motion dismissing MGE's DMCA claim. We also AFFIRM the district court's grant of a permanent injunction against GE/PMI's use of MGE's software and trade secrets. We REVERSE the district court's denial of GE/PMI's Rule 50(a) motion on MGE's copyright infringement, unfair competition, and misappropriation of trade secrets claims for MGE's failure to prove damages under 17 U.S.C. § 504(b) and Texas law, and RENDER a take-nothing judgment for MGE.