United States Court of Appeals,

Fifth Circuit.

No. 92-8172.

RESOLUTION TRUST CORPORATION, as Receiver of First Savings of Arkansas, F.A., Plaintiff-Appellee-Cross-Appellant,

v.

Cliff CRAMER, et al., Defendants,

Cliff Cramer and Robert E. Greer, Defendants-Appellants-Cross-Appellees,

and

Gary Maxfield, Defendant-Cross-Appellee.

Nov. 16, 1993.

Appeals from the United States District Court for the Western District of Texas.

Before GOLDBERG, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

GOLDBERG, Circuit Judge:

The Resolution Trust Corporation ("RTC") brought this suit against several defendants including Cliff Cramer, Robert E. Greer, and Gary Maxfield to recover unpaid rent payments under two commercial leases and the guaranties of those leases. The RTC alleged that during the last ten months of primary terms of the leases, from June of 1989 through March of 1990, the tenants paid only a portion of the rent payments that were due. The RTC also charged that the tenants held over for nine months, until December of 1990, but only paid portions of the rent due for April and May of 1990. Thereafter, the tenants ceased paying rent altogether. After a trial, a jury determined that Cramer, Greer, and Maxfield were each individually liable for certain amounts of unpaid rent. However, the jury also found that the RTC could have mitigated a portion of its damages by taking possession of the leased premises after the primary terms of the leases had expired. After the district court reduced the amount of damages that the jury awarded based on the jury's finding on mitigation of damages, the court entered judgment against Cramer, Greer, and Maxfield in varying amounts. The district court awarded attorney's fees and costs to the RTC, but it also reduced these amounts based on the jury's finding regarding mitigation.

Cramer and Greer's appeal and the RTC's cross-appeal require us to address six issues. First, we must decide whether Cramer is liable under the guaranties that he signed for the unpaid rent that accrued after the primary terms of the leases. Second, we must address Cramer and Greer's assertion that the rent was actually paid in full during the primary terms of the leases because, in June of 1989, the rent was reduced to the level that the tenants paid. Third, we must determine whether the RTC was under a duty to mitigate its damages. Fourth, we must decide whether the defendants' liability is individual or joint and several. Fifth, we must determine whether the jury should have awarded the full amount of damages pleaded. Finally, we are asked to determine whether the RTC's attorney's fees and costs awards were properly reduced. We will address these issues in turn.

## I. Facts and Proceedings Below

On May 18, 1984, Cramer and Maxfield signed a commercial lease on behalf of their company, The Body Shop Fitness Centers, Inc., for space in a Midland, Texas shopping center. This lease will be called the "Body Shop Lease". On July 29, 1985, Cramer and Maxfield individually signed another lease agreement for more commercial space in the same shopping center. A fitness club called the Fitness Connection was opened in this space. This lease will be referred to as the "Fitness Connection Lease".

When the leases were executed, Cramer and Maxfield signed guaranties of those agreements. The guaranties are identical in all relevant respects. Each of the guaranties reveals that Cramer and Maxfield agreed to guarantee "the full performance of each and all of the terms, covenants and conditions of said lease to be kept and performed by said Tenant, including the payment of all rentals and other charges to accrue thereunder."

The original lease agreements were both amended and assigned. In October of 1988, the Body Shop Lease was amended to reduce the monthly rent to $9,000 per month and to extend the primary term of the lease so that it would end on March 31, 1990. The Fitness Connection Lease was also modified in October of 1988 by two amendments which reduced the monthly rent to $6,000 per month and adjusted the primary term of the lease so that it too would expire on March 31, 1990. Moreover, in December of 1988, and with the approval of the landlord at that time, the tenants' rights

and duties under the Body Shop Lease and the Fitness Connection Lease were assigned to Richard Freeman, Ralph Fuquay, and Greer. The RTC later succeeded to the rights of the lessor under both leases. The leases contain identical contractual "holding over" provisions. These terms read as follows:

> Any holding over after the expiration of the said term, with the consent of the Landlord, shall be construed to be a tenancy from month to month, and shall be on the terms and conditions herein specified, so far as applicable.

According to the RTC, in June of 1989, the rent payments on both of the leases came into default. From June of 1989 through March of 1990, the end of the primary terms, the tenants under the Body Shop Lease paid only $6,000 per month instead of the $9,000 per month called for in the lease. Similarly, during the same period, the tenants under the Fitness Connection Lease paid only $3,000 per month instead of the agreed upon $6,000 per month. Moreover, although the primary terms of the leases expired on March 31, 1990, the new tenants continued to occupy both leased spaces until sometime in December of 1990. The tenants paid only a portion of the rent that was due under the leases during April and May of 1990.[1] However, after May of 1990, the tenants did not make rent payments under either lease.

The RTC then filed this suit to collect the unpaid rent payments that accrued during the primary terms of the leases and the contractual holdover periods. The RTC claimed that under the Body Shop Lease, $29,998.00 remained unpaid for the primary term, and $67,716.75 was due for the contractual holdover period. Under the Fitness Connection Lease, $30,000.00 remained unpaid for the primary term, and $48,387.80 was due for the contractual holdover period. Thus, according to the RTC, the unpaid rent payments for both leases totalled $176,102.55.

After a one-day trial, a jury determined that Cramer owed the RTC $88,000 for unpaid rent on both leases from June 1, 1989 through December 31, 1990 and that Maxfield owed the RTC $70,400 and Greer owed the RTC $17,600 for failing to pay the rent on the same leases for the same period of time. The total of these three awards is $176,000. However, the jury also found that the

---

[1] During these months, the tenants paid $15,490.50 of the rent that accrued under the Body Shop Lease and $6,509.50 of the rent that accrued under the Fitness Connection Lease.

RTC could have mitigated its damages by $67,500 by taking possession of the leased premises after the primary terms of the leases had expired.

The district court then entered judgment on the jury verdict. Since the jury found that the RTC could have avoided by virtue of mitigation of damages $67,500 of the $176,000 that the jury awarded, the district court reduced the liability of each defendant by the fraction of the damages that RTC could have avoided. The court thus entered judgment for the RTC against Cramer for $54,250, against Maxfield for $43,400, and against Greer for $10,850. The district court awarded attorney's fees and costs to the RTC, but these awards were also reduced by the fraction of the damages that RTC could have avoided. Cramer, Greer, and the RTC then perfected the present appeals.

## II. Cramer's Liability on his Guaranties

In his appeal, Cramer contends that he is not liable for any unpaid rent that accrued after March 31, 1990, the date on which the primary terms of both the Body Shop Lease and the Fitness Connection Lease expired. However, Cramer signed two guaranties that clearly state that they were intended to insure the payment of all of the rent that was to accrue under these leases. Thus, to determine whether Cramer is liable for the unpaid rent that accrued after March 31, 1990, we must examine the guaranties that Cramer signed and the leases that were guaranteed.

In the interpretation of a guaranty contract, our ultimate goal is to determine the intent of the parties. *Resolution Trust Corp. v. Northpark Joint Venture,* 958 F.2d 1313, 1320 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993). Our first task, though, is to decide whether the guaranties are ambiguous. This inquiry is a question of law for the court to decide. *Temple-Inland Forest Prods. Corp. v. United States,* 988 F.2d 1418, 1421 (5th Cir.1993). According to Texas law, if a guaranty contains an ambiguity, it should be construed in favor of the guarantor. *Coker v. Coker,* 650 S.W.2d 391, 394 n. 1 (Tex.1983); *Western Bank-Downtown v. Carline,* 757 S.W.2d 111 (Tex.App.—Houston [1st Dist.] 1988, writ denied). However, Cramer does not contend, and we do not find, that the guaranties at issue in this case are ambiguous. Therefore, we will construe the guaranties as a matter of law and enforce them according to their terms. *Federal Deposit Ins. Corp. v. Nobles,* 901 F.2d 477 (5th Cir.1990); *Coker,* 650 S.W.2d at

393.

In each of the guaranties at issue in this case, Cramer agreed to guarantee "the full performance of each and all of the terms, covenants and conditions of said lease to be kept and performed by said Tenant, including the payment of all rentals and other charges to accrue thereunder." Cramer also acknowledged that his guaranties would "continue in favor of the Landlord *notwithstanding any extension,* modification, or alteration of said lease entered into by and between the parties thereto, or their successors or assigns, or notwithstanding any assignment of said lease...." (emphasis added).

Cramer argues that the question that we must address is whether each lease should be construed to contain a self-executing extension mechanism in which the holdover period is considered to be merely an extension or continuation of the original lease or whether the holdover period should be construed to create "new" month to month tenancies with the same terms each month. Cramer contends that the tenants' holding over did not extend the original leases. In other words, Cramer concludes that the rent payments that accrued during the holdover period should be considered to arise out of entirely "new" leases to which his guaranties do not apply, not out of an "extension, modification, or alteration" of these leases. However, we do not agree with Cramer's contentions.

Cramer relies heavily on *Bockelmann v. Marynick,* 788 S.W.2d 569 (Tex.1990). In that case, a husband and wife jointly leased a duplex for a twelve-month term. The lease contained a holdover provision that provided as follows:

> Should Tenant remain in possession of the demised premises with the consent of the Lessor after the natural expiration of this lease, a new tenancy from year to year shall be created between Lessor and Tenant which shall be subject to all the terms and conditions hereof but shall be terminable by 60 days notice.

Shortly before the twelve-month term expired, the wife moved out of the duplex. The husband held over and remained in possession of the premises for almost two years. The husband eventually defaulted on the rent payments that accrued under the year to year tenancies that were created by the holdover provision of the lease. The question presented to the *Bockelmann* court was whether the landlord could recover from the wife the unpaid rent that accrued during the year to year tenancies. The Texas Supreme Court held that the landlord could not recover. The court reasoned that since

the lease provided that "a "new tenancy' would be created if the tenant remained in possession beyond expiration of the lease," *id.* at 571, according to the "express terms of the lease, [the] holdover tenancy was a new tenancy rather than an extension or renewal of the original lease." *Id.* at 571-72 (footnote omitted). The court thus concluded that the husband's holdover tenancy was not "a continuation of the original tenancy he held jointly with [his wife], but was rather a new tenancy for which he alone was liable." *Id.* at 572.

However, in the case before us, we believe that when Cramer agreed to guarantee the payment of all of the rent that was to accrue under the leases "notwithstanding any extension", he obligated himself to pay for any rent that became due during the contractual holdover periods. We reach this conclusion because the language of the "holding over" provisions of the leases reveals that the month to month tenancies created after the expiration of the primary term should be deemed to be contractual extensions of the leases rather than "new" leases with similar terms. The Body Shop Lease and Fitness Connection Lease contemplated that the tenants could remain in possession of the leased premises. These leases supplied the terms for any such extensions, providing that "[a]ny holding over after the expiration of the said term ... shall be construed to be a tenancy from month to month...." In *Bockelmann,* however, the lease itself explicitly defined the holdover period to be a "new tenancy." 788 S.W.2d at 571-72. Thus, since the contractual holdover provisions of the Body Shop Lease and Fitness Connection Lease demonstrate that the holdover period is an agreed upon continuation of each lease, we find that the contractual holdover period represents a type of "extension" of the leases within the meaning of the guaranties. Accordingly, since Cramer agreed to guarantee "the payment of all rentals and other charges to accrue" under the leases "notwithstanding any extension[s]", the guaranties make Cramer liable for the rent that accrued during the contractual holdover period.[2]

### III. The Alleged Reduction of Rent

---

[2]It has been suggested that if Cramer had no control over whether Freeman, Fuquay, and Greer could remain on the premises, our holding theoretically exposes Cramer to limitless liability. However, Cramer agreed to guarantee all of the "modifications and extensions" of the leases "notwithstanding any assignment". Thus, the specter of infinite liability is not inherent in our holding but is instead a peculiarity of the guaranties that Cramer voluntarily entered into.

Cramer and Greer assert that in June of 1989, the rent for both the Body Shop Lease and Fitness Connection Lease was reduced to the amount that the tenants actually paid during the primary terms of the leases. More specifically, Cramer and Greer argue that the rent on the Body Shop Lease was reduced from $9,000 per month to $6,000 per month. They contend that this fact explains why the tenants paid only $6,000 of rent per month on the Body Shop Lease for the ten month period from June of 1989 through March of 1990. Similarly, Cramer and Greer maintain that the rent on Fitness Connection Lease was reduced from $6,000 per month to $3,000 per month. Again, Cramer and Greer assert that this fact shows why the tenants paid only $3,000 of rent per month on the Fitness Connection Lease from June of 1989 through March of 1990. Accordingly, Cramer and Greer claim that they are not liable for the $29,998.00 that remains unpaid for the primary term of the Body Shop Lease and the $30,000.00 that remains unpaid for the primary term of the Fitness Connection Lease. Cramer and Greer also argue that they are not liable for $27,000.00 of the $67,716.75 of unpaid rent that accrued during the nine month contractual holdover period under the Body Shop Lease. Similarly, Cramer and Greer contend that they are not liable for $27,000.00 of the $48,387.80 that accrued during the nine month contractual holdover period under the Fitness Connection Lease. In response, the RTC notes that the agreements upon which Cramer and Greer rely for their contention that the monthly rent on the two leases was reduced were not signed by the landlord. Moreover, the RTC introduced into evidence excerpts from the deposition of Jean Nix, who testified that amount of unpaid rent actually due was $176,102.55.

No defendant moved for judgment as a matter of law on this issue at the close of the evidence or after the verdict was returned. *See* Fed.R.Civ.P. 50. Consequently, this objection is being raised for the first time on appeal, and our review is thus extremely limited: "It is the unwavering rule in this Circuit that issues raised for the first time on appeal are reviewed only for plain error," and we will reverse "only if the judgment complained of results in a "manifest miscarriage of justice.' " *McCann v. Texas City Refining, Inc.,* 984 F.2d 667, 673 (5th Cir.1993) (quoting *Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 297 (5th Cir.1978)). Therefore, the issue before us is whether there is *any* evidence to support the amount of damages for which the jury found Cramer and Greer liable. *Id.*

Given the fact that the agreements upon which Cramer and Greer rely for their contention that the monthly rent on the two leases was reduced were not signed by the landlord, and were therefore ineffectual, and the fact that Jean Nix testified that the landlord's records showed that Cramer and Greer were liable for $176,102.55 of unpaid rent, we conclude that there was evidence to find that Cramer and Greer were liable for the amounts awarded by the jury.[3]

## IV. The Duty to Mitigate

Over the RTC's timely objection, the district court instructed the jury to determine the amount of damages that the RTC could have "avoided or mitigated by taking possession of the leased premises after the primary lease terms expired." The RTC contends that the district court erred by submitting this issue to the jury because Texas common law does not impose a duty on a lessor to mitigate its damages.

Most of the cases to which the parties have referred us discuss the legal consequences of a lessee's decision to abandon a leased premises during the primary term of a lease. Under Texas law, if a lessee abandons a leased premises before the expiration of the primary term of a lease, the abandonment does not necessarily terminate the lessor's rights under the lease. Instead, the lessor may either (1) treat the lessee's conduct as an anticipatory breach of the contract, consider the contract to be terminated, and hold the lessee for damages or (2) disregard the abandonment, keep the contract alive, and sue for the rent that accrues thereafter. *Speedee Mart, Inc. v. Stovall,* 664 S.W.2d 174, 177 (Tex.App.—Amarillo 1983, no writ); *Stubbs v. Stuart,* 469 S.W.2d 311 (Tex.Civ.App.—Houston [14th Dist.] 1971, no writ). Moreover, under Texas law, a landlord has traditionally had no duty to mitigate its damages if a tenant abandons the leased premises. *See, e.g., Metroplex Glass Center, Inc. v. Vantage Properties, Inc.,* 646 S.W.2d 263, 265 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). However, in *Brown v. Republicbank First National Midland,* 766 S.W.2d 203, 205 (Tex.1988), four concurring justices and one dissenting justice of the Texas Supreme Court advocated adopting a rule that requires lessors of abandoned leaseholds to mitigate their damages.

---

[3]Moreover, as we will show in part VI, *infra,* the $102.55 discrepancy between the amount of damages that the jury awarded and the amount that RTC claimed can be attributed only to a mechanical or arithmetic error or oversight.

Nevertheless, the majority opinion in *Brown* did not address this issue, and Texas intermediate appellate courts still adhere to the rule that Texas common law does not impose on landlords a duty to mitigate their damages once the leased premises has been abandoned. *See Cassidy v. Northwest Tech Center Assoc., Ltd.,* 785 S.W.2d 407, 412 (Tex.App.—Dallas 1990, writ denied); *Marynick v. Bockelmann,* 773 S.W.2d 665, 673 (Tex.App.—Dallas 1989), *rev'd on other grounds,* 788 S.W.2d 569 (Tex.1990).

The issue in the present case, however, is whether the RTC was under any legal duty to mitigate its damages during the contractual holdover period, a period during which the leased premises remained occupied by the same tenants who possessed the buildings during the primary terms. According to the terms of the leases, any holding over was to be construed to create tenancies from month to month. When the tenants remained in the leased premises at the beginning of each month, the landlord was entitled to hold the tenants liable for the rent due for that month.[4] Therefore, for each month that Freeman, Fuquay, and Greer remained on the premises of the Body Shop and the Fitness Connection after the primary terms of the leases had expired, the RTC had a right to hold the tenants for the rent payments due that month. The RTC was not under a common law duty to evict the tenants. Hence, no duty to mitigate damages is applicable in this case, and the RTC had a right to expect rent payments from the tenants while they occupied the premises. The district court should not have submitted to the jury an issue regarding mitigation of damages because, under the facts of this case, mitigation of damages has no applicability.

## V. Individual or Joint and Several Liability

The jury's verdict and the district court's judgment assessed varying amounts of damages individually against each defendant. However, this differentiation of damages among the defendants was not correct. The liability of the guarantors, Cramer and Maxfield, should not have been individualized because the guaranties executed by Cramer and Maxfield expressly state that the

---

[4]Texas law provides that "[t]he right of the landlord to hold a holdover tenant for another term is not affected by the length of time the tenant holds over but will arise if the tenant holds over for a few days or for a single day, unless the circumstances are such as to excuse the holding over." *Marynick v. Bockelmann,* 773 S.W.2d 665, 668-69 (Tex.App.—Dallas 1989), *rev'd on other grounds,* 788 S.W.2d 569 (Tex.1990).

liability incurred by the guarantors "shall be joint and several." Moreover, Freeman, Fuquay, and Greer each signed the Assignment and Assumption Agreements for the Body Shop Lease and the Fitness Connection Lease. Generally, "joint and several liability arises when two or more persons cosign a contract." *Marynick v. Bockelmann,* 773 S.W.2d 665, 668 (Tex.App.—Dallas 1989), *rev'd on other grounds,* 788 S.W.2d 569 (Tex.1990); *Guynn v. Corpus Christi Bank & Trust,* 620 S.W.2d 188, 190 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). Therefore, when Greer assumed the obligations of the tenants under the leases, he became jointly and severally liable for all of the unpaid rent that accrued while he was a tenant.

## VI. The Amount of Damages

The RTC next contends that the district court should have granted its motion for judgment as a matter of law on the issue of the amount of damages that it was entitled to recover. At the close of the evidence, the RTC moved pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on its claims against all of the defendants, contending that it had proved that the defendants were jointly and severally liable for accrued but unpaid rent in the sum of $176,102.55. The district court denied this motion and submitted the case to the jury. As noted above, the jury returned a verdict in favor of the RTC and awarded the plaintiff certain sums against each defendant. However, the amounts that the jury awarded the RTC totalled only $176,000.00. Pursuant to Federal Rule of Civil Procedure 50(b), the RTC then renewed its motion for judgment as a matter of law, and, in the alternative, moved for a new trial. The district court denied this motion as well.

We review the rulings on the Rule 50(a) and (b) motions *de novo,* employing the same standards that the district court applied. For both motions, we consider all of the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Barnett v. I.R.S.,* 988 F.2d 1449, 1453 (5th Cir.), *petition for cert. filed,* 62 U.S.L.W. 3166 (U.S. August 30, 1993) (No. 93-336). If the facts and inferences point so strongly and overwhelmingly in favor of one party that the reviewing court believes that reasonable jurors could not have arrived at a contrary verdict, then we will conclude that the motion should have been granted. *Crist v. Dickson Welding, Inc.,* 957 F.2d 1281, 1285 (5th Cir.) (citing *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969)

(en banc)), *cert. denied,* --- U.S. ----, 113 S.Ct. 187, 121 L.Ed.2d 132 (1992).

The RTC maintains that it is entitled to judgment as a matter of law against all defendants for the full amount of unpaid rent that it pleaded and proved: $176,102.55. It is clear and unmistakable that this is the correct sum, once it is found that there is liability and that it is joint and several. The RTC proved that it was the owner of the landlord's rights under the leases and guaranties at issue, that the defendants were the signatories on the leases and guaranties, and that rent payments in the amount of $176,102.55 remained due and owing. However, without any factual or legal justification whatsoever, the jury substituted the figure $176,000.00 for the correct amount of damages that the RTC suffered: $176,102.55. Since the record will only justify the award of the full amount of damages pleaded, we render judgment in favor of the RTC for the full amount of unpaid rent, $176,102.55. On remand, we instruct the district court to enter a $176,102.55 judgment jointly and severally against Cramer, Greer, and Maxfield.

## VII. Attorney's Fees and Costs

The RTC also argues that the district court erred when it reduced the RTC's attorney's fees and costs awards. The district court reduced the fees and costs awards, apparently because the jury found that the RTC could have mitigated its damages. Given our holding on the mitigation issue, we vacate the attorney's fees and costs awards and remand to the district court for the determination of attorney's fees and costs.

## VIII. Conclusion

The judgment is AFFIRMED in part, REVERSED and RENDERED in part, and REVERSED and REMANDED in part. This case is REMANDED to the district for further proceedings and entry of judgment consistent with this opinion.