IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-31073
_____


ANGELA SCRIBER LEE,

                              Plaintiff-Appellant,

          v.

WILLIAM DAVID THOMPSON,

                              Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Louisiana
(97-CV-177)
_____

September 28, 1999

Before KING, Chief Judge, STEWART, Circuit Judge, and ROSENTHAL,
District Judge[*].

PER CURIAM:[**]

     Plaintiff-appellant Angela Scriber Lee appeals from the

judgment of the district court, by which the district court

granted defendant-appellee William David Thompson's motion for

judgment as a matter of law pursuant to Federal Rule of Civil

Procedure 50(a) and dismissed plaintiff-appellant's § 1983 action

_____

     [*] District Judge of the Southern District of Texas, sitting
by designation.

     [**] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

on the ground that defendant-appellee is entitled to qualified immunity.  We affirm.

## I.  FACTUAL AND PROCEDURAL HISTORY

Plaintiff-appellant Angela Scriber Lee filed suit pursuant to 42 U.S.C. § 1983 against defendant-appellee William David Thompson on January 27, 1997, alleging that Thompson "under color of state law in his capacity as coroner of Richland Parish," deprived her of her "fourteenth amendment right to liberty[,] without due process, by issuing a commitment order resulting in her incarceration in a mental hospital."  Thompson filed two summary judgment motions contending that he was entitled to qualified immunity.  The district court denied both motions on the ground that genuine issues of material fact concerning whether Thompson's actions were objectively reasonable precluded summary judgment.

A jury trial began on August 31, 1998.  Two witnesses testified during Lee's case-in-chief, Thompson and Lee.  According to Thompson's testimony, Thompson was the coroner for Richland Parish, Louisiana in January 1996.  He was also the medical director of the Rayville Guest House, a private nursing home located in Rayville, Louisiana at which Lee was employed as a social worker.  On the morning of January 29, 1996, Tammy Greer and Greg Lee (Greg) contacted Thompson regarding Lee.  Greer and Greg are siblings, and Greg was Lee's husband at the time.  Greer and Greg informed Thompson that Lee had been acting irrationally of late.  They described an incident that had occurred two days

2

earlier in which Lee locked herself in a room with the couple's two minor children. The room contained a gun and, according to Greg, Lee placed the gun to his head when he entered the room. Greer told Thompson that Lee had been extremely depressed and had suffered from mood swings. Greer also related an incident that occurred in October 1995 in which Lee had stated that she was depressed and suicidal. Thompson testified that Greer called him several times that day and that Greer was "pushing" for the hospitalization of Lee. He considered Greer to be an "aggressive individual" who was protective of her brother, but he testified that he considered Greer's information to be reliable because he had no reason to believe she was anything other than a concerned family member.

Following these conversations with Greer and Greg, Thompson contacted Lee at her job and made an appointment for Lee to visit him in his office that afternoon. During the interview, Lee agreed that she was depressed, that she was suffering from mood swings, and that her anti-depressant medication was not working. According to Thompson, Lee also admitted to hostility toward her husband and her older child, but denied pulling a gun on her husband and denied stating that she was going to kill herself. Thompson could not remember whether Lee told him that Greg had been physically abusive toward her, but he admitted that it was possible and that it would have been relevant to his determination. Thompson stated that Lee also informed him that

3

she had an appointment on the following day with a psychiatrist, and that he tried, but was unable, to reach the psychiatrist.

According to Thompson, whenever he concluded that a patient met the criteria for involuntary commitment, he tried to convince the patient to choose voluntary commitment instead because treatment generally worked better in that situation. He informed Lee that she could either commit herself voluntarily or that he could have her committed involuntarily through the issuance of a coroner's emergency certificate (CEC). Thompson testified that he considered Lee's situation to be an emergency, but did not feel that it was necessary to call the sheriff's department to take Lee to the hospital. He further testified that although he knew she was planning to pick up her children from the babysitter after the meeting, he allowed her to go because he felt she was compliant and understood her need for hospitalization. Thompson stated that he felt that it was in Lee's best interest to be able to say goodbye to her children and to enter the hospital voluntarily.

According to Thompson, prior to these events, he knew Greer and Lee only in passing, and had never had any prior contact with Greg. He further testified that he had no knowledge of marital problems between Greg and Lee other than the problems related to him during his January 29, 1996 conversations with Greer, Greg, and Lee.

After the meeting with Lee, Thompson filled out a CEC that included the following description of Lee: "Twenty-four year old

4

white female, [de]lusional, suicidal, possibly homicidal.  Pulled unloaded gun on husband."   According to Thompson, he characterized Lee as delusional because she believed that Greg and Greer were out to get her, and because she expressed anger with her mother, with her in-laws, and with Thompson himself. Thompson stated that he filled out the CEC because he had "objective evidence of a young lady who was potentially dangerous to herself and others."

Thompson testified that he did not tell Lee that he had executed the CEC, and that he gave the CEC to Greg with instructions to use it only if Lee refused to commit herself voluntarily.  He stated that the CEC was never used because Lee voluntarily committed herself, and that the CEC did not appear in any of Lee's hospital medical records.  According to Thompson, he never told anyone at the hospital about his findings with regard to Lee.  He testified that he became aware that Greg had used the CEC in filing for an award of custody of the Lees' children in a divorce proceeding, but that he had no knowledge of any divorce proceeding at the time he filled out the CEC.

Lee then took the stand.  According to her testimony, at her meeting with Thompson, she denied Greer's and Greg's allegations concerning her mental state, her use of a gun on January 27, 1996, and her suicidal tendencies.  In her version of the January 27, 1996 incident, she went apartment hunting with her children in the morning because she was planning to move out, a fact which Greg knew.  She testified that when she asked Greg for deposit

money, he began hitting and choking her in front of their daughter.  Lee stated that she then took the children into the bedroom and locked the door to keep Greg away from them.  Greer arrived thirty minutes later, at which point Lee told Greer to go home because the fight was none of her business.  According to Lee, although Greg kept guns in the bedroom closet, she did not pull out a gun and did not threaten her husband or herself.  Lee testified that she told Thompson that she and Greg were planning to divorce because of Greg's abuse in front of the children.

During her testimony, Lee admitted to having emotional problems, but contended that she had sought help for those problems by seeing a counselor after the birth of her younger child.  She admitted to telling Thompson about the earlier counseling she had received and about her appointment with a psychiatrist for the day after the meeting with Thompson.  She testified that she had informed Thompson that she was experiencing some mood swings and depression and that her anti-depressant medication was not working.  She further testified that she had told Thompson that she believed that Greg and Greer were "pulling a stunt" and had contacted Thompson because Lee intended to file for divorce.  Lee denied having "angry outbursts" at her older child, but admitted to "fussing" at her too much.

According to Lee, she did not go to the hospital voluntarily.  She testified that she asked Thompson if she had a choice and he replied that she really did not.  Lee stated that

when she left Thompson's office, Greer was waiting for her and followed her home. Once home, Lee refused to go to the hospital. According to Lee, Greg and Greer called Thompson and forced her to speak with him. She testified that Thompson told her that she had to go to the hospital. She further testified that upon arriving at the hospital, she told the employees that she did not want to be there and that she would not be there if "he hadn't done this." She stated that she signed the voluntary commitment form because she had been threatened with involuntary commitment if she did not do so. She pointed out that she also signed a request for release, which would have entitled her to go free after seventy-two hours, and contended that she rescinded that request only after she learned that Greg had filed for divorce two days after her admittance to the hospital. According to Lee, her doctor told her that it was not in her best interest to leave immediately in light of the divorce filing and the possible ramifications on her custody case. She acknowledged that her hospital input papers did not mention any threats or coercion, but stated that she "wouldn't expect them to."

Lee left the hospital one week later, but was not allowed to see her children for nineteen days. She admitted that after her release, she continued outpatient therapy with the hospital, but contended that she did so after being instructed to by a court. She testified that she was presently off her medication and was almost functioning normally again, but stated that the whole situation had been very painful.

At the close of Lee's case-in-chief, Thompson moved for

judgment as a matter of law pursuant to Federal Rule of Civil

Procedure 50(a).  The district court granted the motion and

dismissed Lee's case with prejudice.  In ruling on the motion,

the district court stated,

> In this case this court has twice denied defendant's motion
> for summary judgment on the ground of qualified immunity
> because . . . at the stage of the proceeding when those
> motions were filed the court perceived the existence of
> genuine disputes as to the underlying historical facts of
> the case.  Specifically the parties presented conflicting
> evidence as to the communications between the plaintiff and
> the defendant during the defendant's January 29, 1996[]
> interview with the plaintiff.  And the court was uncertain
> as to the nature of the relationship, if any, . . . between
> the defendant and Greg Lee, the plaintiff's former husband,
> and Tammy Greer, the plaintiff's sister-in-law.  After
> hearing the plaintiff's evidence which consisted of both her
> testimony and the testimony of the defendant, the court
> finds there is no dispute as to any material underlying
> historical fact that g[a]ve rise to the defendant's decision
> to sign the coroner's emergency certificate on January 29,
> 1996.

The district court then held that Thompson was entitled to

qualified immunity because his actions were objectively

reasonable in light of the information he had about Lee at the

time he made the decision to fill out the CEC, even if some of

the information he relied upon ultimately turned out to be

incorrect.  The district court entered final judgment in

Thompson's favor on September 2, 1998.  Lee timely appeals.

## II.  STANDARD OF REVIEW

We review de novo the district court's grant of judgment as

a matter of law pursuant to Federal Rule of Civil Procedure 50(a)

and apply the same standards as the district court.  See

Resolution Trust Corp. v. Cramer, 6 F.3d 1102, 1109 (5th Cir.

8

1993).  We must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  See id.  "If the facts and inferences point so strongly and overwhelmingly in favor of the moving party that the reviewing court believes that reasonable jurors could not have arrived at a contrary verdict, then we will conclude that the motion should have been granted."  Id.; see Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969) (en banc).

### III. DISCUSSION

Thompson is entitled to qualified immunity "'unless it is shown that, at the time of the incident, he violated a clearly established constitutional right.'"  Mangieri v. Clifton, 29 F.3d 1012, 1015 (5th Cir. 1994) (quoting Spann v. Rainey, 987 F.2d 1110, 1114 (5th Cir. 1993)); see Siegert v. Gilley, 500 U.S. 226, 231 (1991).  Determining entitlement to qualified immunity is a two-step inquiry.  First, we "must determine whether plaintiff has alleged a violation of a clearly established right." Fontenot v. Cormier, 56 F.3d 669, 673 (5th Cir. 1995); see Mangieri, 29 F.3d at 1016 (stating that a court must "consider whether the asserted constitutional injury involved a clearly established right at the time of the unfortunate event.") (internal quotation marks omitted).  The contours of the right allegedly violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Meadowbriar Home for Children, Inc. v. Gunn, 81 F.3d 521, 530 (5th Cir. 1996).  It is clear that Lee has alleged the

9

violation of a clearly established right—namely, the right not to be deprived of her liberty without due process protection.  None of the parties disputes that the first step of our inquiry is met.

Second, we must consider whether Thompson's actions were objectively reasonable.  See Mangieri, 29 F.3d at 1016; Spann, 987 F.2d at 1114. "Objective reasonableness is assessed in light of legal rules clearly established at the time of the incident." Mangieri, 29 F.3d at 1016; see Spann, 987 F.2d at 1114. Louisiana law provides that,

> Any physician or psychologist may execute an emergency certificate only after an actual examination of a person alleged to be mentally ill . . . who is determined to be in need of immediate care and treatment in a treatment facility because the examining physician or psychologist determines the person to be dangerous to self or others or to be gravely disabled.

LA. REV. STAT. ANN. 28:53(B)(1).

The district court found that the undisputed evidence presented during Lee's case-in-chief demonstrated that Thompson's decision to execute a CEC was objectively reasonable, and that no disputed issues of fact precluded this conclusion.  According to the district court, the testimony established that, at the time Thompson made the decision to cause Lee's commitment, he was presented with information that Lee had locked herself into a bedroom with her children and a gun, had pointed the gun at her husband, and had previously considered suicide.  Thompson also interviewed Lee, who admitted to depression, mood swings, and uncontrollable anger.  In light of the information confronting

10

Thompson, the district court found that it was objectively reasonable for Thompson to sign the CEC, even if the information upon which he based his decision turned out to be inaccurate.

We agree with this conclusion, and therefore find that the district court did not err in granting Thompson's motion for judgment as a matter of law. As the district court noted, there is no evidence that Thompson ever had any extended contact with Greg or Greer prior to January 29, 1996, and thus there is no evidence that Thompson had a reason to be biased in their favor or to believe their version of events over Lee's. Thompson was presented with serious allegations concerning Lee's behavior—namely, that she had threatened her husband with a gun in front of their children and that she had contemplated suicide. Thus, Thompson was faced with evidence that Lee was potentially dangerous to herself and to others. Louisiana law permits a physician to issue a CEC if, after interviewing the patient, the physician finds her to be "dangerous to self or others." Id. Although Lee denied handling the gun and denied being suicidal, she did admit that she was depressed, that she was suffering from mood swings, that her current anti-depressant medication was not working, that she was in need of treatment, and that she had an appointment for treatment the following day. Even if Greg's and Greer's allegations about Lee were not wholly accurate in retrospect, that is not enough to defeat Thompson's entitlement to qualified immunity. "'The qualified immunity standard gives ample room for mistaken judgments by protecting all but the

11

plainly incompetent or those who knowingly violate the law.'" Mangieri, 29 F.3d at 1017 (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)) (further internal quotation marks omitted). Accordingly, the district court did not err in concluding that Thompson is entitled to qualified immunity.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.