United States Court of Appeals
Fifth Circuit

**F I L E D**

September 9, 2004

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-41279

_____

DAVID E. WEBB; THOMAS DIXON,

Plaintiffs-Counter Defendants–Appellees,

versus

CAI WIRELESS SYSTEMS INC; ET AL

Defendants

JARED ABBRUZZESE,

Defendant-Counter Claimant–Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:02-CV-5

_____

Before REAVLEY, JONES AND DENNIS, Circuit Judges

PER CURIAM:[*]

Defendant-Appellant Jared Abbruzzese appeals from a jury
verdict awarding damages to Plaintiffs-Appellees David Webb and
Thomas Dixon on their fraud claims against him.  Because
Abbruzzese failed to present properly his contentions on appeal

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

1

in the district court, our review is quite limited.  Finding no plain error, we affirm.

## I.    Facts and Proceedings

In the late 1990s, Webb served as chief executive officer of CS Wireless Systems, Inc., and Dixon was CS's senior vice president in charge of operations.  Abbruzzese was chairman of the board of directors of CS and their chief executive officer of CAI Wireless Systems, Inc., the parent company of CS.

During this time, CAI's senior management was seeking a "strategic partner"–i.e., a major telecommunications firm–to invest in or purchase CAI and CS.  But a major obstacle hampered CAI's ability to market CS: Heartland Wireless, a company that owned a minority interest in CCS.  During an October 1998 meeting in Dallas, CAI and CS management formulated a plan to deal with the Heartland problem.  The plan involved CAI buying out Heartland's stake in CS, followed by a merger of CAI and CS.  It was hoped that the resulting company would then be in abetter position to attracted a purchaser or a merger partner.  The executives were particularly interested in attracting MCI WorldCom as a joint-venture partner, since (among other things) WorldCom lacked a wireless business and thus was likely to retain many CAI and CS employees after a merger.

While the senior managers were in Dallas for this strategy meeting, Abbruzzese and Webb met privately over dinner.  Webb testified at trial that Abbruzzese used this dinner as an

opportunity to persuade him and Dixon to remain with the company, so that the two would employ their superior contacts in the industry to help Abbruzzese achieve the plan described above. In 1997, Webb and Dixon had signed three-year employment contracts with CS, which granted each a number of options to purchase CS stock. According to Webb, during the dinner in October 1998, Abbruzzese promised that both Webb's and Dixon's CS options would "come forward," meaning that the CS options would be replaced by options to buy stock in the post-merger company.

In December 1998, CAI bought Heartland's interest in CS. About a month later, Abbruzzese telephoned Webb. Webb testified that Abbruzzese told him that Sprint had recently bought a substantial position in CAI. Webb also testified that Sprint was the worst possible strategic partner. Since Sprint already had a wireless business, Abbruzzese claimed that Sprint would not need to retain CAI's and CS's management. Abbruzzese also claimed that Sprint was only interested in obtaining the broadband telecommunications spectrum owned by CAI and CS at a cheap price. According to Webb, ABBRUZZESE encouraged Webb and Dixon to negotiated separation agreements with CS before Sprint took over the company, and Abbruzzese offered to help them do so before he too was terminated by the impending new owner. Webb testified that he tape-recorded this conversation with Abbruzzese and played it for Dixon.

3

Believing that their hard work at CS was for naught, Webb and Dixon both signed separation agreements and accepted severance packages in February 1999. Each separation agreement contained a release of any claims that the departing executive might have against CS or any of its affiliates or employees, including Abbruzzese. The separation agreements also extinguished Webb's and Dixon's stock options in CS. In addition, Webb and Dixon entered into consulting agreements, which obligated each to aid in the selling of certain CS assets.

A few weeks after Webb and Dixon signed their separation agreements, the two remaining senior executives at CS (the company's chief financial officer and its general counsel and three less-senior CS employees all received a number of CAI stock options.

Meanwhile, CAI executives continued the search for a strategic partner for CAI and CS, although the two companies never formally merged. In March of 1999, CAI shares were trading at $1.625; by April, the price had driven dramatically to $9.50 per share. At that point, a bidding war for CAI developed (principally between Sprint and WorldCom), which drove the price of CAI stock even higher. Despite this bidding war and Abbruzzese's claims to Webb a few months earlier, Sprint never purchased an interest in CAI. Near the end of April, it was WorldCom that bought CAI for $28 per share. As part of this acquisition, all the CAI stock options held by CAI and CS

4

employees became fully vested and were exercised.  Abbruzzese realized $8,317,500 on his CAI options.

Plaintiffs testified that they learned about the WorldCom purchase from an April 1999 media report and that in October 1999 they reviewed a proxy statement for the transaction and discovered that Abbruzzese had lied to them in January 1999 about Sprint buying a large interest in CAI.  Disgruntled about missing out on the profitable WorldCom deal, they field suit against CS and CAI in Texas state court in November 2001.  The two companies removed the case to federal district court on the basis of diversity jurisdiction, and the Plaintiffs amended their complaint to add claims against Abbruzzese.  Plaintiffs' cause of action against CS and CAI were later severed from this suit against Abbruzzese after the two companies filed suggestions of bankruptcy as a result of the bankruptcy of WorldCom.

In May of 2003, Plaintiff's case against Abbruzzese proceeded to trial, with Plaintiffs alleging three claims under Texas law: (1) breach of contract; (2) statutory stock fraud; and (3) fraud.  Regarding their fraud claim, Plaintiffs averred that they signed their separation agreements and agreed to leave CS in reliance on Abbruzzese's fraudulent misrepresentation that Sprint had bought an interest in CAI and planned to terminate all CAI and CS executives.

At the close of Plaintiffs' evidence, the trial judge granted judgment as a matter of law to Abbruzzese on Plaintiff's

5

breach of contract claims, concluding that the evidence might support a contract between Plaintiffs and CAI, but not Abbruzzese. The jury found that Abbruzzese had committed fraud and stock fraud, and it awarded Webb $5,160,000 in actual damages and $1,125,000 in exemplary damages. Dixon was awarded $1,159,601 in actual damages and $1,125,000 in exemplary damages. Abbruzzese appeals, contesting: (1) the accuracy of the compensatory damages interrogatory submitted to the jury; (2) the evidence supporting the jury's finding that Plaintiffs did not waive their fraud claims against Abbruzzese; and (3) Plaintiff's evidence on compensatory damages.

## II. The Compensatory Damages Interrogatory

The jury verdict in this case consisted of answers to a series of special interrogatories. Abbruzzese disputes the wording of the special interrogatory on compensatory damages for fraud, which read as follows

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate David Webb and/or Thomas Dixon for their damages, if any, proximately caused by Jared Abbruzzese's fraud?

> Consider the following elements of damages, if any, and none other: the value of the opportunity, if any, to receive stock options that David Webb and/or Thomas Dixon gave up in reliance upon the fraud.

On appeal, Abbruzzese presents two challenges to this interrogatory. He first contends that the jury should have been asked whether Plaintiffs had demonstrated "by a preponderance of

6

the evidence that they would have in reasonable certainty received options." Abbruzzese emphasizes that–even if he had not committed fraud–other factors could have prevented Plaintiffs from receiving CAI stock options. In Abbruzzese's view, this interrogatory failed to ask the jury to decide whether Plaintiffs probably would have obtained the options absent his fraud. In other words, Abbruzzese's first objection essentially argues that the jury was not required to determined if his conduct caused the damages claimed by the Plaintiffs.

Second, Abbruzzese maintains that this interrogatory invited the jury to determine the value of the mere opportunity or chance to receive stock options in CAI and to award that amount to Plaintiffs. According to Abbruzzese, Texas law prohibits recovery for loss of a chance.

As an initial matter, Plaintiffs respond that Abbruzzese did not raise his current objection in the district court. To preserve error regarding a jury charge, the complaining party must have complied with Rule 51 of the Federal Rules of Civil Procedure. Rule 51 requires a party challenging a jury charge to state "distinctly the matter objected to and the grounds of the objection." FED. R. CIV. P. 51 (May 2003) (amended Dec. 2003). This rule "is intended to provide the trial court with an opportunity to correct any error it may have made in the instruction before the jury begins its deliberation." 9A CHARLES

ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2553, at 400 (2d Ed. 1995).

In the charge conference, Abbruzzese's lawyer contested the use of the term "opportunity," arguing that: "there is no opportunity in this case as it currently exists giving [sic] the striking of the breach of contract action. We would submit that an appropriate term would be 'entitlement' if any to receive stock options." Twice more Abbruzzese's counsel urged the court to replace "opportunity" with "entitlement." But the attorney never elaborated on why "entitlement" was preferable beyond his initial reference to the court's granting judgment as a matter of law to Abbruzzese on Plaintiffs' breach of contract claim. In other words, it appears that the sole basis of the objection was the district court's conclusion that Plaintiffs had not presented enough evidence for the jury to find that Abbruzzese was contractually bound to deliver the CAI options to Plaintiffs. Abbruzzese's obscure objection did not provide the trial court with an opportunity to address either of his current contentions.[1]

---

[1]While the entitlement reference could theoretically be related to Abbruzzese's first argument on appeal, which regards causation, use of the term "entitlement" in this context lacks support in Texas law. Cf. Taita Chem Co. v. Westlake Styrene, LP, 351 F.3d 663, 667 (5th Cir. 2003)("[T]he appellant must show that the proposed instruction offered to the district court correctly stated the law."). Abbruzzese presents no authority for the proposition that Plaintiffs had to demonstrate that the were legally entitled to the CAI options in order to recover damages. Under Texas law, consequential damages are available for losses proximately caused by a tortfeasor's fraudulent

We therefore conclude that Abbruzzese did not state "distinctly the matter objected to and the grounds of the objection." FED R. CIV. P. 51. "Rule 51 holds litigants to a difficult standard of error preservation for good reason. It requires that objections be brought before the trial judge for a possible remedy at the trial court level, saving judicial resources." Taita Chem. Co. v. Westlake Styrene, LP, 351 F.3d 663, 668 (5th Cir. 2003). Consequently, we review Abbruzzese's challenge to the compensatory-damages interrogator for plain error only. Id.; Russell v. Plano Bank & Trust, 130 F.3d 715, 721 (5th Cir. 1997).

This standard requires the party to demonstrate that: (1) the district court erred; (2) the error was plain; (3) the plain error affected the party's substantial rights; and, (4) failure to correct the error would seriously affect the fairness, integrity, or public reputation of the proceedings. E.g., Taita Chem., 351 F.3d at 668. To show that the interrogatory was erroneous, Abbruzzese must establish that, viewing the interrogatory as a whole, it creates "substantial and

---

conduct. See Arthur Anderson & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 816 (Tex. 1997); see also El Paso Dev. Co. v. Ravel, 339 S.W.2d 360, 364 (Tex. Civ. App. 1960, writ ref'd n.r.e.)("We believe the law to be well settled in Texas, as well as under general principles as to damages, that an injured party is entitled to recover in a tort action such damages as result directly, naturally and proximately from fraud. However, remote damages, or those which are too uncertain for ascertainment, or are purely conjectural, speculative or contingent, cannot be recovered.").

9

ineradicable doubt whether the jury [was] properly guided in its deliberations." Id. at 667. Even if the interrogatory was erroneous under this standard, we will affirm nonetheless if we determine, based on the entire record, that the "error could not have affected the outcome of this case." Taita Chem., 351 F.3d at 667. "This standard provides the district court great latitude concerning the charge." Id.

The thrust of Abbruzzese's current objection to the compensatory-damages interrogatory centers on causation. Abbruzzese contends that the interrogatory permitted the jury to award Plaintiffs damages without finding that they were either more likely than not or reasonably certain to receive CAI stock options absent Abbruzzese's fraud. He points out that several other events could have caused Plaintiffs not to receive CAI stock options even absent the fraud-e.g., the Plaintiffs might have left CS for another reason before being granted CAI options.

We do not agree that the compensatory-damages interrogatory, read as a whole and considered along with the other jury instructions, permitted the jury to award damages to Plaintiffs without finding that those damages were proximately caused by Abbruzzese's fraud. The charge contained the following instructions regarding damages:

> You may award compensatory damages only for injuries that an injured party proves were proximately caused by the other party's allegedly wrongful conduct. . . .You should not award compensatory damages for speculative injuries, but only for those injuries which the injured party has actually

10

suffered or that the injured party is reasonably likely to suffer in the future.

. . .

> If you decide to award compensatory damages, you should be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require that an injured party prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.

> You must use sound discretion in fixing an award of damages, drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

In addition, the instructions included a definition of proximate cause-the accuracy of which neither party disputes. And the complained of interrogatory asked the jury to compensate the Plaintiffs for any damages "proximately caused by Jared Abbruzzese's fraud."[2] Read as a whole, see Taita Chem., 351 F.3d at 669-70, the charge and the interrogatory required the jury to determine that the Plaintiffs' damages were proximately caused by Abbruzzese's conduct.

Interspersed with his causation argument, Abbruzzese also argues that the compensatory-damages interrogatory invited the jury to compensate Plaintiffs for a mere lost opportunity or

---

[2]Initially, the compensatory-damages interrogatory lacked the proximate-cause element. Abbruzzese's counsel objected to this omission in the charge conference. Plaintiffs agreed that proximate cause is a necessary element of consequential damages, and the parties and the court proceeded to debate how best to incorporate that element into the instructions. They decided to add this proximate-cause reference to the compensatory-damages interrogatory and to include in the jury instructions the aforementioned general instruction defining proximate cause.

11

chance to gain CAI options. He relies on <u>Kramer v. Lewisville Mem. Hosp.</u>, 858 S.W.2d 397 (Tex. 1993) for the proposition that Texas law does not allow a party to recover damages for the loss of a chance. In <u>Kramer</u>, the Texas Supreme Court held that a plaintiff cannot recover "for negligent treatment that decreases a patient's chance of avoiding death or other medical conditions in cases where the adverse result probably would have occurred anyway." 858 S.W.2d 398. Critically, the <u>Kramer</u> court focused on causation, explaining that if a plaintiff did not have to show that the defendant medical professional's negligence probably caused her injury, "we do not believe that a sufficient number of alternative explanations and hypotheses for the cause of the harm are eliminated to permit a judicial determination of responsibility." <u>Id.</u> at 405. To be sure, the Texas Supreme Court rejected the contention that a lost chance of survival is a "discrete compensable injury," but it did so because it felt that the truth seeking function of the law demands that a plaintiff prove that the tortfeasor was more likely than not the cause of the complained-of harm. <u>Id.</u> Here, as shown above, the jury instructions and the compensatory-damages interrogatory required the jury to determine that Abbruzzese proximately caused Plaintiffs' claimed damages. Even if the use of the term "opportunity" was somewhat misleading, "the result is not a clear and obvious error that seriously affects substantial rights and the fairness, integrity, or public reputation of the judicial

12

proceedings."[3]  <u>Taita Chem.</u>, 351 F.3d at 668-69.  Therefore, we do not find plain error.

## III. Waiver of Plaintiffs' Fraudulent-Inducement Claims

On appeal, Abbruzzese asserts that no evidence supports the jury's finding that Plaintiffs did not waive their rights to sue for fraud.  Abbruzzese notes that the separation agreements that Plaintiffs signed when they left CS contained releases of liability.  At trial, Abbruzzese relied on these releases, and Plaintiffs countered that the releases were unenforceable because Abbruzzese had fraudulently induced Plaintiffs to sign the separation agreements containing the releases.  The trial judge submitted a special interrogatory on waiver to the jury, and the jury found that neither Plaintiff had waived his right to complain about Abbruzzese's fraud.  On appeal, Abbruzzese asserts that the evidence at trial conclusively demonstrated that Plaintiffs ratified the releases by continuing to accept benefits under their consulting agreements after they learned of Abbruzzese's fraudulent conduct.  Accordingly, Abbruzzese maintains that no evidence supports the jury's answer to the waiver interrogatory.

As Abbruzzese concedes, he failed to present this argument in his motion for judgment as a matter of law in the district

---

[3]Again, we note that Abbruzzese has not shown that the alternative term proposed by his trial counsel, "entitlement," would have improved the accuracy of the compensatory-damages interrogatory.  <u>See</u> <u>supra</u> note 1.

13

court.  Thus, we review for plain error.  <u>See, e.g.</u>, <u>Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs Inc.</u>,293 F.3d 912, 920-21 (5th Cir. 2002).  When applying the plain-error standard in the context of a challenge to the sufficiency of the evidence, this court asks only whether there was <u>any</u> evidence supporting the jury verdict.  <u>Id.</u> And "we may not question the sufficiency of whatever evidence we do find."  <u>Little v. Bankers Life & Cas. Co.</u>, 426 F.2d 509, 511 (5th Cir. 1970).  Our review is, therefore, "extremely limited."  <u>See</u> <u>Resolution Trust Corp. v. Cramer</u>,6 F.3d 1102, 1107 (5th Cir. 1993).

Abbruzzese's argument that Plaintiffs' continued acceptance of benefits under their consulting agreements waived their rights to rescind the releases in their separation agreements depends on his assertion that the two documents compose one contract.  In asserting that the two documents compose one contract, Abbruzzese claims that the district court held that they were a single contract and that the court directed the jury to consider them as such.  The waiver interrogatory stated that the jury could find that Webb or Dixon or both "intentionally renounced their right to claim fraud" "by continuing to accept benefits under the Separation Agreement and/or the Consulting Agreement."  While the district court might plausibly have concluded that the two documents comprised one agreement, we do not think that the court, in fact, had so concluded.  We do not read the "and/or" phrase in this interrogatory as directing the jury to view the

14

documents as a single contract. Rather, through this wording, the court permitted the jury to find–as the jury did– that the Plaintiffs did not intentionally waive their right to rescind the releases in the separation agreements when they continued to accept benefits under the consulting agreements.

We conclude that there was some evidence from which the jury could find that Plaintiffs did not, by accepting benefits under their consulting agreements, intend to waive their rights to rescind the releases that were procured by Abbruzzese's fraud. The separation agreement and the consulting agreement were contained in separate documents, and the jury heard testimony that they were two separate agreements. In addition, Webb testified that his fulfillment of his obligations under the consulting agreement "had nothing to do with [Abbruzzese] lying to me." Accordingly, we hold that Abbruzzese has not met his stringent burden of showing plain error in order to prevail on appeal.

## IV. Evidence on Compensatory Damages

Finally, Abbruzzese contends on appeal that no evidence supports the amount of compensatory damages awarded by the jury. Specifically, Abbruzzese asserts that Plaintiffs presented no evidence of the number of CAI options that they would have received had Plaintiffs not left CS. Abbruzzese claims that all of the evidence presented by Plaintiffs concerning the number of options lost was based on their breach-of-contract theory, i.e.,

15

their allegation that Abbruzzese promised them that their CS options would "come forward" after the merger that never occurred. Abbruzzese therefore reasons that, because the district court refused to send Plaintiffs' breach-of-contract claim to the jury, the record contained no evidence upon which the jury could base a finding that Plaintiffs lost a certain number of options as a result of Abbruzzese's fraud.

Here again, Abbruzzese admits hat he did not challenge the sufficiency of the evidence on fraud damages in his motion for judgment as a matter of law. Consequently, "the issue before us is whether there is <u>any</u> evidence to support the amount of damages for which the jury found [Abbruzzese] liable." See <u>Cramer</u>, 6 F.3d at 1108 (emphasis added). Under this standard, we conclude that there was certainly evidence upon which the jury could have based its damages award. Specifically, as noted above, the jury heard that several CS executives–who were at or below Plaintiff's level–received CAI options in March of 1999, shortly after the Plaintiffs were induced to leave by Abbruzzese's fraud. From this, the jury could have concluded that absent Abbruzzese's fraud, Webb and Dixon would have remained at CS and received CAI options, which were the same options that became quite lucrative in April of 1999, when CAI was acquired by WorldCom. Accordingly, there was no plain error.

## V. Conclusion

16

Accordingly, we AFFIRM the judgment of the district court.